1998-NMSC-014

967 P.2d 807

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Shawn Matthew DUFFY, Defendant–
Appellant.**

No. 22667.

Supreme Court of New Mexico.

May 20, 1998.

Phyllis H. Subin, Chief Public Defender, Susan Gibbs, Assistant Appellate Defender, Santa Fe, for Appellant.

Hon. Tom Udall, Attorney General, Max Shepherd, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

FRANCHINI, Chief Justice.

{1}  Shawn Matthew Duffy appeals from his convictions of the first-degree felony murder of Elizabeth Somerville, robbery with an old-age enhancement, and tampering with evidence.  Duffy raises six issues on appeal. We conclude that Duffy's right to be protected from double jeopardy was violated by his convictions for both felony murder and robbery; that the robbery was a proper predicate felony to the felony murder; that, under the doctrine of cumulative error, Duffy was not denied a fair trial by the admission of prejudicial evidence, by the court's refusal to sever the charge of possession of drug paraphernalia, or by prosecutorial misconduct; and that no evidence should be suppressed because of the warrantless search of Duffy's person and the mobile home in which he was arrested.  We affirm Duffy's convictions for felony murder and tampering with evidence, and we vacate, on double-jeopardy grounds, his conviction for robbery.

## I.  FACTS

{2}  On March 7, 1994, at about 6:00 p.m., Elizabeth Somerville arrived at the Manor Care Nursing Home to pick up her husband who was a client in a day-care program for victims of Alzheimer's disease.  As she walked from her car she was attacked by a man who knocked her down, inflicted a fatal wound to her head, and ran off with her purse.  An autopsy revealed that she incurred several bruises caused by the struggle over her purse and that she died as a result of a "cranial cerebral injury."  At the time of her death, Somerville was seventy-six years old.

{3}  Several people witnessed the attack. Michael Friedlander, who was in the Manor Care parking lot getting into his truck, heard Somerville yell and saw her resisting a man who swung her around, pushed her to the ground, possibly hit her, and then took off running.  Friedlander later described the man as having sandy-colored or brown hair and a fairly long beard.

{4}  Bridgette Foster and Jason Forkel were across the street from Manor Care, parking their cars in a lot near the CitiBank building where they both were employed. Foster was distracted by the commotion outside the nursing home and was suddenly surprised by a man who ran directly in front of her car causing her to hit the brakes.  She parked her car and walked to where she could observe the man, who by then had entered a yellow van.  Foster got a good look at the man and noticed that he was stuffing something dark and bulky, possibly a purse,

under his shirt. Foster later described the assailant as having shoulder-length hair which was "sandy blonde" or "dish water blonde."

{5} Foster told Forkel, "I think I saw somebody get mugged ." As the van drove away, Forkel took note of the license number and the vehicle's description, and was able to get a brief look at the driver. Forkel later described the man as having "sandy dark" or "dirty blonde" hair which was "shaggy."

{6} The observations of these witnesses were recorded by police and broadcast in an "All Points Bulletin." Shortly before midnight of the same day, a police officer noticed that a yellow van matching the description of the escape vehicle was parked at a Circle K convenience store. Other police were summoned, including Sergeant Reynaldo Sandoval, the Albuquerque Police Department Officer in charge of investigating Somerville's homicide, and Officer A.V. Romero. Richard Greene, the driver of the van, was placed in the back of a police vehicle, may have been handcuffed, and was questioned. The police officers concluded Greene did not fit the witnesses' description of the purse snatcher. Greene told the police that Shawn Duffy, who at that moment was in Greene's mobile home, had been driving the van earlier that day. According to Sergeant Sandoval, Greene's description of Duffy matched the descriptions of the assailant given by the eyewitnesses.

{7} The police asked for Greene's permission to go to and search. his home. Greene made it clear he did not like the fact that Duffy was in his home and said to the police, "Yes, you can have my permission to search." He expressed concern about the woman with whom he lived, Charlene Creel, as well as the children who lived in the trailer, but he gave the officers permission to "[d]o anything you want. Keep her out of danger. Go ahead and go through whatever you want."

{8} Based on the information given by Greene, the police officers went to the mobile home between 1:00 and 2:00 in the morning and surrounded it. Uniformed officers approached the front door. The front door was open, and through the closed screen door they saw Duffy inside. Sergeant Sandoval,

upon seeing Duffy, knew that he matched the descriptions of the individual who had attacked Somerville and determined at that moment to arrest Duffy. The officers identified themselves and told Duffy that they wanted to speak to. him. Duffy immediately backed or ran away from the screen door. Because Duffy moved away from the door, the officers could no longer see him. The police thought he was trying to flee and were concerned about their own safety as well as the safety of the people who lived in the trailer. The police opened the screen door and went into the mobile home. As they entered, Duffy became agitated and aggressive, and screamed and yelled demanding to see a warrant. They tried to calm him down by saying, "Hey, we just need to talk to you," but he continued to yell and curse.

{9} The police arrested Duffy and searched his person and later searched the home. In the pockets of the pants Duffy was wearing they found airline cards belonging to Somerville, a pocket knife, and a syringe. In his boots they found a .22 caliber handgun. Somerville's credit cards and checkbook were found on a coffee table in the living room.

{10} The day after the purse-snatching incident, the eyewitnesses Foster and Forkel picked Duffy's picture from a six-picture photo array as the man they had seen attack Somerville. Forkel was somewhat less confident about his identification than was Foster. Sometime during the next few days, Friedlander saw Duffy's photograph on the evening news. He had no doubt that the man in the photograph was the same man he saw struggling with Somerville on March 7.

## II. PROCEEDINGS

{11} On March 15, 1994, a grand jury indicted Duffy under several alternative theories of murder with an enhancement because of the elderly age of the victim, NMSA 1978, § 30–2–1 (1994) (murder); NMSA 1978, § 31–18–16.1 (1993) (old-age enhancement); NMSA 1978, § 30–2–3 (1994) (manslaughter); robbery with an old-age enhancement, NMSA 1978, § 30–16–2 (1973) (robbery); § 31–18–16.1 (old age); tampering with evidence, NMSA 1978, § 30–22–5

(1963); possession of a firearm or destructive device by a felon, NMSA 1978, § 30–7–16 (1987); and possession of drug paraphernalia, NMSA 1978, § 30–31–25.1(A) (1981, prior to 1997 amendment).

{12} In August 1994 Duffy made several preliminary motions, four of which are relevant to this appeal, and these were addressed in an October hearing. Duffy moved to sever the charges of felon in possession of a firearm and possession of drug paraphernalia, arguing that he would be prejudiced if they were not addressed in a separate trial. Severance was granted only for the firearm charge. He moved to exclude evidence that he claimed was irrelevant including the fact that Somerville's husband suffered from Alzheimer's disease. This motion was denied. A motion to exclude all prior convictions was granted with the exception that Duffy, if he testified, could be cross-examined regarding a 1988 conviction for residential burglary. Duffy argued that the searches of the mobile home and his person were warrantless, not proper as an incident to a lawful arrest, conducted without valid consent, and not excused by any exigent circumstances. He moved to suppress all physical evidence seized from these searches. Among the evidentiary items at issue were the syringe found in Duffy's pants pocket and the .22 caliber handgun found in his boots. The court denied the motion to suppress.

{13} The trial began on December 14, 1994. During the trial there were several actions by the prosecution and decisions by the court that Duffy now claims violated his right to a fair trial. We will describe each of these incidents in turn in the remainder of this opinion as we discuss the legal issues they raise.

{14} On October 26, 1994, the jury found Duffy guilty of first-degree felony murder, guilty of robbery with an old-age enhancement, guilty of tampering with evidence, and not guilty of possession of drug paraphernalia. Several months later, in May 1995, Duffy pleaded guilty to the severed charge of felon in possession of a firearm or destructive device, and he admitted that, in light of the fact that he had been convicted of three prior felonies, he was a habitual offender. See

NMSA 1978, § 31–18–17 (1993). The sentences for these crimes were added to his sentences under the October jury verdict, for a total sentence of life plus twenty-one-and-one-half years.

{15} On appeal, Duffy raises six issues: that his convictions for both felony murder and robbery violate constitutional protections against double jeopardy because both crimes are based on the same unitary conduct; that the felony of robbery is not independent from the cause of Somerville's death and so cannot serve as the basis of a conviction of felony murder; that, under the doctrine of cumulative error, he was denied a fair trial by the admission of prejudicial evidence, by the court's refusal to sever the charge of possession of drug paraphernalia, and by prosecutorial misconduct; and that the searches of his person and the mobile home violated his right to be free from unreasonable search and seizure and that all evidence thus obtained should be suppressed as the fruits of a warrantless search. We conclude that the multiple convictions for murder and robbery do violate Duffy's right to be protected from double jeopardy and remand for resentencing on that issue. However, we affirm the trial court on the remaining five issues.

## III. DOUBLE JEOPARDY

{16} Duffy argues, and the State concedes, that the convictions for both felony murder and robbery subject him to multiple punishments for a single offense in violation of his state and federal constitutional protections against double jeopardy. *See State v. Pierce*, 110 N.M. 76, 84, 792 P.2d 408, 416 (1990). We agree and note that this conclusion is supported by the two-part test, established by this Court in *Swafford v. State*, 112 N.M. 3, 13, 810 P.2d 1223, 1233 (1991), which determines whether multiple punishments have been imposed unconstitutionally. Under the *Swafford* test we first inquire "whether the conduct underlying the offenses is unitary," and if so, we next examine "whether the legislature intended to create separately punishable offenses" for the unitary conduct. *Id.; see also State v. Contrer-*

*as,* 1995–NMSC–064, 120 N.M. 486, 489–91, 903 P.2d 228, 231–33.

{17} A detailed explication of the *Swafford* analysis in this case would do little to clarify this particular area of New Mexico law. The State concedes that the conduct underlying the felony-murder and robbery charges was unitary and that the legislature did not intend these offenses, under these circumstances, to be punished separately. Moreover, we have had occasion to apply the *Swafford* test in several very recent opinions. *See, e.g., State v. Mora,* 1997–NMSC–060, ¶ 64, 124 N.M. 346, 361, 950 P.2d 789, 804; *State v. Cooper,* 1997–NMSC–058, ¶¶ 56–62, 124 N.M. 277, 287–88, 949 P.2d 660, 670–71; *State v. McGruder,* 1997–NMSC–023, ¶¶ 22–33, 123 N.M. 302, 307–10, 940 P.2d 150, 155–58; *State v. Livernois,* 1997–NMSC–019, ¶¶ 17–22, 123 N.M. 128, 134–35, 934 P.2d 1057, 1063–64. We therefore vacate Duffy's conviction for robbery and remand this case to the district court with instructions to sentence Duffy solely on the convictions of felony murder and tampering with evidence.

## IV.  FELONY MURDER

{18} Duffy argues that the act of robbing Somerville was not independent from the cause of her death and so cannot serve as the basis of a conviction of felony murder. "In determining whether evidence is sufficient to support a conviction, we must view the evidence 'in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences in favor of the verdict.' " *Contreras,* 120 N.M. at 489, 903 P.2d at 231 (quoting *State v. McAfee,* 78 N.M. 108, 110, 428 P.2d 647, 649 (1967)). The evidence presented in this case, viewed in a light most favorable to the State, supports a conviction for felony murder.

{19} Felony murder, as defined by the New Mexico murder statute, is a form of first-degree murder involving "the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused . . . in the commission of or attempt to commit any felony." Section 30–2–1. The requirements for a felony-murder conviction have been sig-nificantly narrowed and clarified by this Court in recent years.

{20} New Mexico is unique in establishing a mens rea requirement for a felony-murder conviction. We established this requirement in *State v. Ortega:*

> In addition to proof that the defendant *caused* (or aided and abetted) the killing, there must be proof that the defendant *intended* to kill (or was knowingly heedless that death might result from his conduct). An unintentional or accidental killing will not suffice. The intent to kill need not be a "willful, deliberate and premeditated" intent as contemplated by the definition of first degree murder in Subsection 30–2–1(A)(1), nor need the act be "greatly dangerous to the lives of others, indicating a depraved mind regardless of human life," as contemplated by the definition in Subsection (A)(3). Indeed, an intent to kill in the form of knowledge that the defendant's acts "create a strong probability of death or great bodily harm" to the victim or another, so that the killing would be only second degree murder under Section 30–2–1(B) if no felony were involved, is sufficient to constitute murder in the first degree when a felony is involved—or so the legislature has determined.

*State v. Ortega,* 112 N.M. 554, 563, 817 P.2d 1196, 1205 (1991) (citation omitted). Thus, for the doctrine to apply, the killing must be second-degree murder, apart from consideration of the underlying felony. *See State v. Campos,* 1996–NMSC–043, ¶ 19, 122 N.M. 148, 154, 921 P.2d 1266, 1272. In this case, the evidence supports the jury's conclusion that Duffy knew that the act of swinging an elderly person around and causing her to fall to the ground created "a strong probability of death or great bodily harm" to his victim. Duffy possessed the requisite mens rea for second-degree murder, under the New Mexico murder statute. *See* § 30–2–1(B). Thus, if the predicate felony of robbery conforms to the requirements of the ·New Mexico felony-murder doctrine, we will affirm his conviction on that charge.

{21} The mere fact that the murder occurred during the commission of another felony is not sufficient to raise second-degree

murder to first-degree felony murder. In *State v. Harrison* we listed three characteristics that the underlying felony must possess: "(1) there must be a causal relationship between the felony and the homicide, (2) the felony must be independent of or collateral to the homicide, and (3) the felony must be inherently or foreseeably dangerous to human life." *State v. Harrison,* 90 N.M. 439, 441, 564 P.2d 1321, 1323 (1977).

■ {22} *Harrison* defined the causal relationship as follows: "[C]ausation must be physical; causation consists of those acts of defendant or his accomplice initiating and leading to the homicide without an independent force intervening .... Causation in the final analysis primarily deals with the *actus reus* of the crime." *Id.* at 441–42, 564 P.2d at 1323–24 (footnote omitted). In this case, Friedlander testified that he saw Duffy and Somerville struggling, saw Duffy push or swing her to the ground, and perhaps saw him strike her. The evidence at trial showed that Somerville's death was caused by a head injury and that she received bruises that were consistent with a struggle over a purse. The only available evidence about the purse-snatching demonstrates a causal relationship between the robbery and the homicide. The jury concluded that Duffy took Somerville's purse; he committed this act by forcefully wresting it from her while at the same time causing her to fall and hit her head; the outcome of this act was Somerville's death.

■ {23} The second characteristic under *Harrison* is that the felony must be independent of or collateral to the homicide. Duffy argues that, because the robbery of Somerville's purse was the same act that caused her death, the underlying felony cannot be independent of or collateral to the homicide, and the felony-murder conviction cannot stand. This argument is repudiated by the clarification of this area of law by *State v. Campos,* which stresses that in New Mexico we look, not to the nature of the act, but rather to whether the legislature intended that a particular felony should be able to serve as a predicate to felony murder. *See Campos,* 1996–NMSC–043, ¶ 22, 122 N.M. at 155, 921 P.2d at 1273.

■ {24} In *Campos* we held that this question should be answered, in most circumstances, by application of the strict-elements test. Under this test, an offense is deemed to be a lesser-included offense of another only if all of the statutory elements of the lesser offense are completely embodied within the statutory elements of the greater offense "such that it would be impossible ever to commit the greater offense without also committing the lesser offense." *Id.* ¶ 20, 122 N.M. at 155, 921 P.2d at 1273 (quoting *State v. Meadors,* 1995–NMSC–081, 121 N.M. 38, 42, 908 P.2d 731, 735).

{25} It is self-evident, upon application of the strict-elements test, that there was no legislative intent to preclude robbery from serving as a predicate to felony murder. The elements of second-degree murder as set forth in Section 30–2–1(B), include performing acts that result in the killing of a "human being without lawful justification or excuse" and knowledge "that such acts create a strong probability of death or great bodily harm to that individual or another." In contrast, the elements of robbery, as set forth in Section 30–16–2, include "the theft of anything of value from the person of another or from the immediate control of another, by use or threatened use of force or violence." The statutory elements of the lesser offense of robbery are not in any way a subset of the elements of the greater offense of second-degree murder; under these statutory elements, it is obviously possible to commit murder without also committing robbery. *See Campos,* 1996–NMSC–043, ¶ 20, 122 N.M. at 155, 921 P.2d at 1273.

■ {26} The opinion in *Campos* was filed two years after Somerville's murder and two months after oral argument was heard in this case, but we do not believe our application of the strict-elements tests raises any retroactivity problems. The requirement that we look to whether the legislature intended the predicate felony to be a lesser-included offense of second-degree murder was recognized in cases that we issued prior to the crime in question. *See, e.g., Ortega,* 112 N.M. at 563, 817 P.2d at 1205 (stating that "second degree murder ... may be elevated to first degree murder when it occurs

in circumstances that the legislature has determined are so serious as to merit increased punishment"); *State v. Pierce*, 109 N.M. 596, 601, 788 P.2d 352, 357 (1990) (holding that the predicate felony of "kidnapping and the murder were separate and individual crimes"). *Campos* did not set forth a new legal standard; rather, it clarified an existing principle of law. Moreover, we have indicated that a new ruling by this Court is applicable to all criminal cases that are pending on direct appeal. *See State v. Kirby*, 1996–NMSC–069, ¶ 4, 122 N.M. 609, 610–11, 930 P.2d 144, 145–46.

{27} The third characteristic suggested by *Harrison* is whether the underlying felony is "inherently or foreseeably dangerous to human life." *Harrison*, 90 N.M. at 442, 564 P.2d at 1324. This factor requires an examination of "both the nature of the felony and the circumstances surrounding its commission." *Id. Harrison* indicates that this is a factual matter, "for the jury to decide in each case, subject to review by the appellate courts." *Id.* Additionally, we recently stated that there is a presumption of inherent danger "in a felony murder case where the predicate felony is a first-degree felony, but not where the felony is of a lesser degree." *Mora*, 1997–NMSC–060, ¶ 21, 124 N.M. at 353, 950 P.2d at 796. Thus, it was for the jury to decide whether the evidence supported a conclusion that the robbery was inherently or foreseeably dangerous to human life. *See id.* ¶ 25, 124 N.M. at 354, 950 P.2d at 797; *Harrison*, 90 N.M. at 442, 564 P.2d at 1324. On appeal, the jury's verdict will be overturned only upon a showing of insufficient evidence. *Mora*, 1997–NMSC–060, ¶ 27, 124 N.M. at 354, 950 P.2d at 797.

{28} The robbery in this case was a third-degree felony. *See* § 30–16–2. However, viewing the evidence in a light most favorable to the verdict, the dangerous manner in which Duffy committed the robbery is apparent. He grabbed the purse from a seventy-six-year-old woman, swung her around, threw her to the ground, and possibly struck her. The jury reasonably concluded that it was foreseeable that the force required to commit this act was dangerous. *See Harrison*, 90 N.M. at 442, 564 P.2d at

1324. Thus, we affirm Duffy's conviction for felony murder, finding that the murder of Somerville falls within the unique limitations placed upon the felony-murder doctrine by New Mexico law.

## V. CUMULATIVE ERROR

{29} Duffy argues under the doctrine of cumulative error that he was denied a fair trial. He raises three groups of errors that individually may have been minor but, taken has a whole, may have affected the jury's determination. *See State v. Baca*, 1995–NMSC–053, 120 N.M. 383, 392, 902 P.2d 65, 74. He claims that he was deprived of a constitutionally fair trial by the prejudicial admission of the syringe, the gun, and the fact that Somerville's husband had Alzheimer's disease; by the trial court's refusal to sever from the murder trial the charge of possession of drug paraphernalia; and by prosecutorial misconduct. The doctrine of cumulative error requires reversal when a series of lesser improprieties throughout a trial are found, in aggregate, to be so prejudicial that the defendant was deprived of the constitutional right to a fair trial. *See State v. Martin*, 101 N.M. 595, 601, 686 P.2d 937, 943 (1984); *State v. Diaz*, 100 N.M. 210, 215, 668 P.2d 326, 331 (Ct.App.1983). We will now examine each of these alleged errors and their cumulative effect.

### A. Evidence

{30} As mentioned above, the trial court denied Duffy's motion to exclude specific facts and items of evidence including the syringe found in the pants he was wearing, the handgun found in his boots, and the fact that Somerville's husband had Alzheimer's disease. These items were introduced at trial. He claims that this error, in combination with other errors he raises, accumulated to deprive him of a fair trial.

{31} "All relevant evidence is admissible, except as otherwise provided by constitution, by statute, by these rules or by other rules adopted by the supreme court. Evidence which is not relevant is not admissible." Rule 11–402 NMRA 1998. Relevance refers to evidence that tends "to make the existence of any fact that is of conse-

quence ... more probable or less probable than it would be without the evidence." Rule 11–401 NMRA 1998. It is within the discretion of the trial court to evaluate the relevance of evidence. When the relevance is challenged on appeal we will not reverse unless the trial court abused its discretion. *State v. Hernandez,* 1993–NMSC–007, 115 N.M. 6, 19, 846 P.2d 312, 325. The proponent of the evidence bears the burden of affirmatively demonstrating its relevance. *See State v. Lucero,* 1992–NMCA–106, 114 N.M. 489, 492, 840 P.2d 1255, 1258. Under Rule 403, even if evidence is relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Rule 11–403 NMRA 1998.

{32} Evidence of a person's character can be prejudicial and may not, except for specific, listed circumstances, be admitted "for the purpose of proving action in conformity therewith on a particular occasion." Rule 11–404(A) NMRA 1998. Similarly, a defendant who is being tried for particular crimes may be severely prejudiced by evidence of other crimes that are unrelated to the charges, defenses, and issues in the case at hand. This is especially true of evidence of uncharged conduct. *See State v. Garcia,* 99 N.M. 771, 776, 664 P.2d 969, 974 (1983) (discussing duty of court "to excise evidence of uncharged acts if it can be done without destroying the relevancy of the evidence which addresses the charges, defenses or issues"). Under Rule 11–404(B):

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

With these principles in mind, we will examine Duffy's three evidentiary objections. We conclude that any error in admitting these items was harmless.

### 1. Syringe

{33} Duffy argues that the probative value of the syringe was substantially outweighed by unfair prejudice. Rule 11–403. He claims the syringe was used by the prosecution as improper character evidence that caused the jury to infer that because Duffy was a drug user, he acted in conformity with that character and so was more likely to have committed the robbery in order to obtain money for drugs. *See State v. Litteral,* 110 N.M. 138, 142–43, 793 P.2d 268, 272–73 (1990) (evidence of drug paraphernalia relevant to establish motive). Moreover, it raised the prospect that Duffy had committed a crime—using illegal drugs—for which he had not been charged. *See McGhee,* 103 N.M. at 105, 703 P.2d at 882 (discussing prejudice from evidence of uncharged conduct). Additionally, Duffy claims that the syringe is irrelevant to the charge that he was the purse snatcher who killed Somerville.

{34} The prosecution responded that possession of the syringe showed the defendant's motive for robbing the victim. *See Litteral,* 110 N.M. at 142–43, 793 P.2d at 272–73. Additionally, testimony introduced by the State established that the syringe had not been tested to determine if it contained any residue of a controlled substance, nor could it be shown that Duffy actually used the syringe. Furthermore, the testimony showed that Duffy did not have any needle marks on his arms and that the syringe was the type used to inject insulin. Duffy's contention that he was prejudiced by the syringe is undermined by the fact that the jury acquitted him of the charge of possession of drug paraphernalia. While this does not prove that the jury did not believe Duffy was an intravenous drug user, it does suggest, and we hold, that any prejudice he suffered was minimal.

### 2. Handgun

{35} Similarly, Duffy argues that the handgun was more prejudicial than probative because it unfairly implied that he was a violent dangerous man. None of the eyewitnesses claimed to see a gun during the purse-snatching incident and Duffy claims that the gun is irrelevant to that crime. However, the State suggested that the gun was relevant to prove "his intent and the severity of what happened that night, what

his plan was," including a possible danger relating to his apparent intent to flee. The State argues, and we agree, that the evidence is admissible under evidence Rule 11–404(B), as probative of Duffy's intent or plan at the time he was arrested. *See generally State v. Beachum*, 96 N.M. 566, 568, 632 P.2d 1204, 1206 (Ct.App.1981) (discussing exceptions to evidence rule that restricts evidence of wrongful acts that are unrelated to the crime charged).

### 3. Alzheimer's disease

{36} Consistent with his motion, which the court denied, to exclude any mention of the fact that Somerville's husband had Alzheimer's disease, Duffy objected, immediately before the trial, to the fact that Brenna Dotson, a Manor Care employee, was to be called as a witness. During the discussion of this issue, the prosecution had promised, "We will not play it up for sympathy." The trial court denied Duffy's motion to exclude Dotson's testimony. In her opening argument, the prosecutor stated that Somerville's husband

> had Alzheimer's disease. Mrs. Somerville had just very recently made a decision to place him in day care two times a week. . . . Unfortunately, tragically, Mrs. Somerville was never able to take her husband home again. He never saw her alive again. The reason Mr. Somerville [was] never able to see his wife alive again is because of the acts of the man who is on trial here before you today, Shawn Matthew Duffy.

The State called Dotson as its first witness. She described the Manor Care program for persons who suffer from Alzheimer's disease, the dates and times Somerville's husband had attended that program, and the fact that on March 7, Mrs. Somerville did not pick him up. Duffy's repeated objections to her testimony as irrelevant and unduly prejudicial were overruled.

{37} Duffy argues that the State's agreement not to emphasize the evidence of Alzheimer's disease was violated by calling Dotson to testify. He claims the very mention of Mr. Somerville's ailment was used in a highly prejudicial manner to play on the emotions of the jury. The State counters that the trial court determined that the evidence related to Alzheimer's disease was more probative than prejudicial and that the State did not unfairly exploit the matter. The State argues that the evidence that the victim's husband suffered from Alzheimer's disease was relevant to explain why Somerville was at the Manor Care facility on the day of her death; the prosecution did not dwell on the loss to Mr. Somerville and how he was affected by the death of his wife.

### 4. Harmless error

{38} The State's arguments as to the relevance of the syringe, the gun, and the Alzheimer's disease are plausible and are supported by the record. However, we also agree with the State that any error in admitting this evidence was harmless. For an error to be deemed harmless, there must be:

> (1) substantial evidence to support the conviction without reference to the improperly admitted evidence, (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear so minuscule that it could not have contributed to the conviction, and (3) no substantial conflicting evidence to discredit the State's testimony.

*State v. Moore*, 94 N.M. 503, 504, 612 P.2d 1314, 1315 (1980).

{39} Under the first of these criteria, even if the syringe, gun, and Alzheimer's were never admitted into evidence, there is substantial evidence to support Duffy's conviction. Three witnesses positively identified Duffy as the suspect seen at the scene of the crime. Friedlander actually witnessed the attack on Somerville and got a good look at the assailant. A few days later, when he saw Duffy's picture on the evening news, he had no doubt that Duffy was the assailant. During the trial Friedlander reiterated his absolute certainty that Duffy was the man he saw attack Somerville. Foster saw commotion in front of Manor Care and nearly hit a man who suddenly ran in front of her car. She made eye contact with the man and saw him stuff a purse-like object into his shirt. She watched him enter a yellow van and drive away. Shortly thereafter she picked

Duffy's picture out of a photo array. At trial she testified she had no doubt about her identification. Forkel, on Foster's urging, saw Duffy enter the van and took note of the vehicle's license plate. He selected Duffy's picture from the photo array though he expressed some doubt that the person in the photo was the same person he saw the day of the crime. At trial, however, he expressed no misgivings that Duffy was the man he saw enter the yellow van. Greene testified that, during the time when Somerville was attacked, Duffy had been driving the yellow van whose license had been recorded by Forkel at the scene of the crime. Proximate to and actually on Duffy's person, the police found several items that were taken from Somerville during the purse snatching. Thus, Duffy's conviction is supported by substantial evidence.

{40} Under the second criterion of the harmless-error test, the harmlessness of the syringe, gun, and Alzheimer's disease is further supported by the fact that the incriminating evidence against Duffy is overwhelming. The effect of the three disputed items of evidence on the jury's determination was unquestionably minuscule.

{41} Finally, under the third criterion, Duffy offered no substantial evidence to discredit the testimony of the three eyewitnesses, Greene's statement that Duffy drove the van, and Duffy's possession of Somerville's personal belongings. Any error in admitting the syringe, gun, and Alzheimer's disease was harmless.

B. Severance

■■■■ {42} "If it appears that a defendant or the state is prejudiced by a joinder of offenses ... the court may order separate trials of offenses...." Rule 5–203(C) NMRA 1998. Duffy argues that he was prejudiced by the refusal of the trial court to sever the charge of possession of drug paraphernalia from his murder trial. On appeal, our review of whether charges were properly joined is exceedingly narrow. We limit our inquiry to whether, because of the joinder of charges, "there is an appreciable risk that the jury convicted for illegitimate reasons." *State v. Ramming*, 106 N.M. 42, 47, 738 P.2d 914, 919

(Ct.App.1987). Because a defendant's motion to sever charges "depends in a large measure upon the special circumstances of each case," the trial court possesses broad discretion in resolving such motions. *State v. Paschall*, 74 N.M. 750, 752, 398 P.2d 439, 440 (1965). We will reverse only if that discretion has been abused. *See State v. Griffin*, 1993–NMSC–071, 116 N.M. 689, 693, 866 P.2d 1156, 1160. "It is fundamental, however, that courts must not permit a defendant to be embarrassed in his defense by a multiplicity of charges to be tried before one jury." *Paschall*, 74 N.M. at 752–53, 398 P.2d at 440. The defendant bears the burden of showing he was prejudiced by a failure to sever charges. *State v. Gallegos*, 109 N.M. 55, 64, 781 P.2d 783, 792 (Ct.App.1989).

{43} This question turns in part, on whether there is a common thread that links the two charges that the defendant has moved to sever. *See id.* at 64, 781 P.2d at 792; *see also* Rule 5–203(A)(2) (stating two offenses may be joined if they "are based on the same conduct or on a series of acts either connected together or constituting parts of a single scheme or plan"). It is important in this regard to consider, whether, had the two charges been tried separately, evidence of one offense would be admissible at the trial of the other. *See State v. Finchum*, 111 N.M. 716, 719, 809 P.2d 630, 633 (1991). Severance would be strongly supported by a finding that evidence of one charge would be irrelevant, immaterial, or prejudicial at a trial for the other offense. This would occur, for example if the crimes were different, totally unrelated, or remote in time. *See Paschall*, 74 N.M. at 753, 398 P.2d at 440. Further, the fact that the jury was able to separately evaluate evidence applicable to each charge may suggest that the defendant was not prejudiced by joinder. *See Griffin*, 116 N.M. at 693, 866 P.2d at 1160 (discussing the ability of the jury "to evaluate the evidence in terms of each count").

{44} Duffy claims that he was prejudiced because the court's refusal to sever the charge of possession of drug paraphernalia permitted the State to introduce the syringe and suggest he was an intravenous drug user. We have already discussed how the

actual admission of the syringe was harmless error. Here, we address Duffy's argument that he was embarrassed in his defense by the unproven implication that he robbed Somerville because he was a drug addict. He implies this unfairly weighed against him in the minds of the jurors. Duffy claims that the evidence that he possessed drug paraphernalia—the syringe—would have been inadmissible in the murder trial had the drug paraphernalia charge been tried separately; such evidence would be irrelevant to the murder charges. He points out that the drug charge, when compared to the murder charge, involved completely different witnesses, was a completely different and unrelated crime, and was separated in time and place; there was no common thread linking the two. *See Gallegos,* 109 N.M. at 64, 781 P.2d at 792.

{45} The State replies, and we agree, that the jury was obviously able to evaluate the evidence related to the drug charge separately from the other evidence admitted. *See Griffin,* 116 N.M. at 693, 866 P.2d at 1160. The jury concluded that the State had not proven the elements of the charge of possession of drug paraphernalia beyond a reasonable doubt. The jury was able to follow each item of evidence and apply it to each individual charge. *State v. Dominguez,* 1993–NMCA–042, 115 N.M. 445, 453, 853 P.2d 147, 155. Moreover, in light of the overwhelming evidence supporting Duffy's murder conviction, he cannot rationally argue the jury was unfairly influenced in its verdict by the drug charge. Duffy has failed to show that, even if the joinder of charges was an abuse of discretion, he was prejudiced by a lack of severance.

C. Prosecutorial Misconduct

■ {46} Duffy claims he was denied a fair trial because of prosecutorial misconduct. He contends that this error, in combination with other errors just discussed, accumulated to deprive him of a fair trial. The trial court has broad discretion in controlling the conduct and remedying the errors of counsel during trial. *See State v. Pace,* 80 N.M. 364, 371, 456 P.2d 197, 204 (1969). Moreover, the trial court is in the

best position to evaluate the significance of any alleged prosecutorial errors. Thus, in reviewing claims of prosecutorial misconduct, we determine whether the trial court abused its discretion by denying a motion for a new trial based upon the prosecutor's conduct, by overruling the defendant's objection to the challenged conduct, or by otherwise failing to control the conduct of counsel during trial. *Cf. State v. Abeyta,* 1995–NMSC–052, 120 N.M. 233, 247, 901 P.2d 164, 178 (discussing abuse-of-discretion standard in appellate review of prosecutorial misconduct). The trial court's determination of these questions will not be disturbed unless its ruling is arbitrary, capricious, or beyond reason. *State v. Ramos,* 1993–NMCA–071, 115 N.M. 718, 726, 858 P.2d 94, 102. Our ultimate determination of this issue rests on whether the prosecutor's improprieties had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial. *See State v. Jett,* 111 N.M. 309, 314, 805 P.2d 78, 83 (1991).

■ {47} A single instance of prosecutorial misconduct may be so egregious that it may, standing alone, rise to a level of fundamental error and warrant a new trial. *See State v. Peters,* 1997–NMCA–084, ¶ 39, 123 N.M. 667, 676, 944 P.2d 896, 905, *cert. denied,* 123 N.M. 446, 942 P.2d 189 (1997). However, under the doctrine of cumulative error, a series of lesser prosecutorial improprieties may amount to reversible error. *Cf. State v. Ruffino,* 94 N.M. 500, 503, 612 P.2d 1311, 1314 (1980) (discussing prosecutorial misconduct as reversible error). Duffy raises three prosecutorial errors that, he claims, when considered in the context of the other errors he has raised, amount to reversible error: (1) his prior convictions were introduced at trial despite the trial court's order that they be excluded; (2) the prosecution confused the jury by misstating the law in its closing arguments; and (3) the prosecution made reference to prejudicial unproven facts outside the evidence in its closing arguments. We will now examine each of these allegations of prosecutorial misconduct.

1. Prior convictions

■ {48} The trial court granted Duffy's pretrial motion to exclude all prior con-

victions, with the exception that if Duffy testified, he could be cross-examined about a 1988 conviction for residential burglary. Immediately before the trial, in accordance with this pre-trial order, Duffy requested "that the State be instructed to not elicit testimony that the Defendant was at one time on [parole] and that he was in the penitentiary, that he will actually serve time in the penitentiary," and that Greene, when called to testify, be instructed not to mention inadmissible evidence. The trial court so ordered.

{49} Thereafter, Duffy, to whom the court granted the right to participate with counsel at trial, proceeded to make his own opening statement in which he admitted the 1988 conviction for residential burglary. When called to the witness stand, the prosecutor asked Greene, "How do you know Mr. Duffy?" Greene replied, "We met in prison. We became friends with each other about five years." Duffy immediately moved for a mistrial. The trial court denied this motion without any discussion as to whether the jury should be instructed not to consider this improper remark. Later, the prosecutor asked Greene if Duffy lived with him and he replied, "No, not outside of prison, no, ma'am." The prosecutor responded by telling Greene "I would ask you not to refer to that period of time."

{50} Duffy contends that the inadmissible reference to his prison time was the only possible answer Greene could have given to the question, "How do you know Mr. Duffy?"; he argues that this is misconduct because the prosecutor should have realized this question would elicit the inadmissible information. Additionally, Duffy suggests that the prosecutor failed to follow the court's order to instruct Greene not to mention Duffy's convictions. In *State v. Saavedra*, 103 N.M. 282, 284, 705 P.2d 1133, 1135 (1985), we found prosecutorial misconduct under similar circumstances. Furthermore, Duffy claims that his prison record was irrelevant to the murder of Somerville and served the prosecution by prejudicing the jury against him. *See State v. Rowell,* 77 N.M. 124, 126, 419 P.2d 966, 968 (1966) (concluding that questions about the defendant's prior convictions could have no other purpose than to prejudice the jury against the defendant). Thus, Duffy argues that the trial court's denial of his motion for a mistrial was an abuse of discretion and contributed, with the other incidents of prosecutorial misconduct, and the other errors he raises, to an unfair trial.

{51} We do not agree that the trial court's failure to declare a mistrial was an abuse of discretion. "To be sure, evidence of a defendant's prior criminal conduct can be highly prejudicial; if such evidence is not admissible for a specific purpose permitted by the rules of evidence, admission of the evidence can require reversal of a conviction." *State v. Gibson,* 1992–NMCA–017, 113 N.M. 547, 556, 828 P.2d 980, 989 (citations omitted). In this case, however, any prejudice was mitigated by several factors. During his opening arguments, before Greene was called to testify, Duffy himself had already informed the jury of his 1988 conviction; Greene's statement did no more than confirm Duffy's own admission. Moreover, Greene did not explain why Duffy was in prison when they met, nor was Duffy's criminal record emphasized by the witness or the prosecution. *Id.* at 556, 828 P.2d at 989. Additionally, we find nothing in the record to suggest that the prosecutor showed willful disregard for Duffy's right to a fair trial. *State v. Breit,* 1996–NMSC–67, ¶¶ 32–35, 122 N.M. 655, 666–67, 930 P.2d 792, 803–04 (establishing standard of "willful disregard" when prosecutorial misconduct raises double jeopardy questions). The prosecutor may have expected the question, "How do you know Mr. Duffy?" to be answered by a more innocuous remark such as, "We have been friends for years." The statements by Greene appear to have been inadvertent. In light of these circumstances, considered in conjunction with the strength of the case against Duffy, Greene's comments could not have influenced the outcome of the trial. *Cf. Jett,* 111 N.M. at 314–15, 805 P.2d at 83–84 (holding prosecutor's actions did not rise to level of misconduct, but that even if there had been error, it would be harmless in light of overwhelming evidence against defendant).

2. Misstatement of law

{52} During the closing arguments, the prosecutor told the jury, "I just

want to inform you, ladies and gentlemen, that you can convict the Defendant on both forms of murder, felony murder and second degree murder." Duffy claims that encouraging a jury to convict a defendant of both a greater offense and a lesser-included offense is a misstatement of law which constitutes prosecutorial misconduct. He argues that the jury should have been instructed not to consider second-degree murder unless it had first concluded that Duffy was not guilty of first-degree felony murder. Duffy immediately objected to this comment, his objection was overruled, and the prosecutor repeated this comment. Duffy suggests that the jury was confused by this comment. It submitted a note during deliberations asking, "Can the defendant be charged of 2nd Degree murder + robbery—which would not fall under 1st Degree."

{53} "Counsel may not misstate the law. The judge alone instructs the jury on the law, and where counsel attempts to instruct, he invades the province of the court. This is true even where counsel's instruction is legally correct." *State v. Taylor*, 104 N.M. 88, 96, 717 P.2d 64, 72 (Ct.App.1986) (citations omitted). In this case, the prosecutor's statements may have been somewhat imprecise but they were not a misleading misstatement of the law. As we explained above, for the felony-murder doctrine to apply, the killing must be second-degree murder, apart from any consideration of the underlying felony. *See Campos*, 1996–NMSC–043, ¶ 17, 122 N.M. at 154, 921 P.2d at 1272; *Ortega*, 112 N.M. at 563, 817 P.2d at 1205. Under the New Mexico murder statute, second-degree murder is a lesser included offense of all forms of first-degree murder including felony murder. Section 30–2–1(B). If the prosecutor's statements were erroneous at all, it is that they under-emphasized the requirement that the jury must find the mens rea for second-degree murder before it can consider elevating the crime to first-degree felony murder.

{54} Despite the jury's inquiry regarding the relationship between second- and first-degree murder, the verdict shows there was no confusion about how the evidence at trial related to this legal question. As explained above, the law as applied to the evidence in the record strongly supports the jury's verdict of felony murder. Duffy has failed to show that the alleged error was anything but harmless.

3. Reference to facts outside the evidence

{55} Apparently, by the time of the trial, Duffy had trimmed his hair and beard and police witnesses and the eyewitnesses noted that his hair was now darker or more grey than the "sandy blond" color noted on the day Somerville was murdered. In the first closing argument, the first prosecutor stated that Duffy "doesn't look the same way that he looked on March 7, 1994" and that he had "attempted to change his appearance somewhat in preparation for this trial." Later she stated that Duffy "had cut his hair and colored his—his hair color was different." In the rebuttal closing argument, the other prosecutor stated that, while none of the witnesses could explain why Duffy's hair color at trial did not match their description of the assailant, his hair "is different, completely different. In those photographs it is red, then it is black," and he stated, "He changed his hair, cut it, dyed it." Duffy did not object to these comments at trial. However, he now argues that, because no evidence was introduced at trial that Duffy dyed his hair, these comments refer to unproven facts outside the evidence and constitute prosecutorial misconduct. He claims these remarks undermined the reliability of the jury's verdict.

{56} During closing arguments, both the prosecution and defense are permitted wide latitude. *State v. Gonzales*, 1992–NMSC–002, 113 N.M. 221, 229, 824 P.2d 1023, 1031. Nevertheless, the prosecutor's remarks must be based upon the evidence and "the fair and reasonable inferences to be drawn therefrom." *Diaz*, 100 N.M. at 214, 668 P.2d at 330. It is beyond the bounds of valid argumentation to recite prejudicial "facts" that are entirely outside the evidence presented at trial. *State v. Cummings*, 57 N.M. 36, 39, 253 P.2d 321, 323 (1953). It is misconduct for a prosecutor to make prejudicial statements not supported by evidence. *See State v. Bartlett*, 96 N.M. 415, 418, 631

P.2d 321, 324 (Ct.App.1981) (discussing professional standards proscribing questions not supported by evidence). However, should the defendant "open the door" by invoking matters outside the evidence, the prosecution may comment upon these matters. "[S]uch comments are invited and do not constitute reversible error, even if such comments are improper." *Taylor*, 104 N.M. at 94, 717 P.2d at 70. On appeal, we will find error only if the court abused its discretion in admitting the disputed comments or if the comments give rise to fundamental error. *See Abeyta*, 120 N.M. at 247, 901 P.2d at 178.

{57} In testimony, Detective Romero introduced two photographs of Duffy taken the night of his arrest, and described the differences between those photos and Duffy's appearance at trial. He noted that, at trial, Duffy's beard was trimmed and his hair was possibly more grey. Foster testified to the differences in the color and length of the purse snatcher's hair as it compared to the more "groomed" appearance of Duffy's hair at trial. Friedlander identified that Duffy looked "a lot more cleaned up" at trial and had "shorter hair" and a "shorter beard." Forkel stated that, in comparison to the man he saw drive away in the yellow van, Duffy's appearance at trial was "a lot cleaner cut" and that his hair "was a little more greyer." No one testified that Duffy's hair appeared to have been dyed.

{58} Thus, four witnesses testified that Duffy's courtroom appearance was different from his appearance on the night of the robbery. Three of these witnesses testified that Duffy's hair color was different. There was no testimony contradicting the notion that Duffy's hair had somehow changed between his arrest and the date of the trial. One reasonable inference, though not the only possible inference, was that Duffy had caused that change. The prosecutor's comments during the closing arguments "stated conclusions and inferences reasonably drawn from the facts and circumstances and were within the permissible range of argument." *State v. Montoya*, 80 N.M. 64, 68, 451 P.2d 557, 561 (Ct.App.1968). Therefore, the trial court did not abuse its discretion in admitting these comments.

### 4. Prosecutorial misconduct and overwhelming evidence of guilt

{59} On appeal, prosecutorial misconduct will be deemed harmless only if we find that the evidence of guilt is so overwhelming that there can be no reasonable probability that the conviction was swayed by the misconduct. *State v. Hoxsie*, 101 N.M. 7, 10, 677 P.2d 620, 623 (1984), *overruled on other grounds by Gallegos v. Citizens Ins. Agency*, 108 N.M. 722, 731, 779 P.2d 99, 108 (1989); *State v. Day*, 91 N.M. 570, 573–74, 577 P.2d 878, 881–82 (Ct.App.1978). We agree with the State, that any improprieties on the part of the prosecution are outweighed by the overwhelming evidence that supports Duffy's conviction. Even if Duffy has raised valid claims of error, it is apparent that, within the context of the case, any such errors were harmless. *See Contreras*, 120 N.M. at 492, 903 P.2d at 234 (stating that, even if it were error to admit questionable testimony, evidence supporting defendant's guilt was overwhelming).

### D. No Cumulative Error

{60} We have addressed each error that Duffy claims, in aggregate, deprived him of a fair trial: the items of evidence, the refusal of severance, and prosecutorial misconduct. We have concluded in each instance that there was no error, or that, if any error existed, it was harmless and was outweighed by the overwhelming evidence supporting conviction. Therefore, there is no merit to Duffy's claim, under the doctrine of cumulative error, that he was deprived of a fair trial.

## VI. WARRANTLESS SEARCH

{61} The New Mexico Constitution proscribes unreasonable searches and seizures with language similar to that found in the Federal Bill of Rights:

The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be seized, nor without

a written showing of probable cause, supported by oath or affirmation.

N.M. Const. art. II, § 10; *see also* U.S. Const. amend. IV. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). However, courts have identified numerous factual situations that have given rise to a myriad of rules and exceptions that rebut this presumption. *See State v. Attaway,* 1994–NMSC–011, 117 N.M. 141, 145, 870 P.2d 103, 107. Among the recognized exceptions to the warrant requirement are exigent circumstances, consent, searches incident to arrest, plain view, inventory searches, open field, and hot pursuit. *State v. Corneau,* 109 N.M. 81, 89, 781 P.2d 1159, 1167 (Ct.App.1989).

{62} Duffy raises three arguments that implicate some of these rules and exceptions. The conduct of the police in this case should be viewed as three separate phases: warrantless entry, warrantless arrest, and warrantless search. Duffy's first claim is that he had standing to object to a warrantless entry and search of the mobile home despite the fact that Greene and Creel were the actual lessees of the home; this argument does not address the arrest phase. Duffy's second claim is that the State failed to establish that this warrantless entry into the home was justified by probable cause and exigent circumstances; this argument refers only to the entry and arrest phases. Duffy's third claim is that the State failed to prove that, prior to entering and arresting Duffy, the police received from Greene knowing, voluntary, and intelligent consent to search his home; this argument does not address the arrest phase. The legal question of whether the evidence from the warrantless search should have been admitted is meaningful only within the context of the facts of this case. The issue of suppression thus raises a mixed question of law and fact and our review on appeal is de novo. *Attaway,* 117 N.M. at 145–46, 870 P.2d at 107–08.

A. Standing

{63} Duffy contends that he had standing to object to a warrantless entry and search of the mobile home in which he was arrested. The thrust of his argument is that, though he did not live full-time in the home of Greene and Creel, he nevertheless could assert his right against unreasonable searches and seizures of those premises.

{64} Duffy testified that he had been living with Greene and Creel in the mobile home for four or five weeks prior to his arrest. He claimed he paid rent and utilities, slept on the couch almost every night, and, in dealing with a bail bonding company, listed the mobile home as his residence. In contrast, Creel testified that Duffy never resided in the mobile home; he would occasionally spend "a couple of hours" at the home during the day, but never spent the night. She stated that around the time of the murder he and Greene "were having words" and that Duffy was not welcome in their home. She testified Duffy never paid for any rent, groceries, or utility bills. She believed that he kept his belongings in a commercial storage shed and he never stored any belongings at their home. She remembered that he received one letter at the home. The only time Duffy ever showered at the mobile home was the night of the murder.

{65} After a hearing on this issue, in light of the contradictory accounts of Creel and Duffy, the trial court found "that Mr. Duffy had a somewhat attenuated legitimate expectation of privacy in the premises searched," and speculated that Duffy's situation might be "more than mere presence." However, the court denied Duffy's suppression motion because the warrantless entry and search were justified by exigent circumstances.

{66} We conclude that, even if Duffy did have standing to object to the warrantless search and seizure, the police obtained valid consent to enter the home from Greene who unquestionably had authority over the premises. An individual has authority to consent to the search of a dwelling if that person actually possesses the property or has common authority with others who are in possession. *See Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39

L.Ed.2d 242 (1974); *State v. Larson*, 94 N.M. 795, 797, 617 P.2d 1310, 1312 (1980); *State v. Clark*, 105 N.M. 10, 14, 727 P.2d 949, 953 (Ct.App.1986). *But see State v. Wright*, 119 N.M. 559, 564–65, 893 P.2d 455, 460–61 (Ct. App.1995) (holding that one individual must have actual authority and not just "apparent authority" to consent to warrantless search of another individual's premises). Presuming that Duffy is correct in asserting a possessory interest in the mobile home, he would have shared common authority over the home with both Greene and Creel. Any co-inhabitant in the home has the right to permit an inspection by police, and the other cohabitants "have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988.

{67} We will now address why, despite Duffy's qualified right to object to the warrantless search, the actions of the police were justified by both exigent circumstances and Greene's voluntary consent to search.

### B. Exigent Circumstances

{68} Before police may make a warrantless nonconsensual entry into a person's home to make an arrest, the arrest must be justified by probable cause, and immediate entry must be impelled by one of the judicially defined exceptions to the prohibition against unreasonable searches and seizures. *Cf. Barreras v. New Mexico Corrections Dep't*, 1992–NMSC–057, 114 N.M. 366, 369, 838 P.2d 983, 986 (discussing requirement of reasonableness and exceptions that justify warrantless entry). Duffy disputes the trial court's conclusion that there was probable cause to arrest and that exigent circumstances justified the warrantless entry into the mobile home.

{69} Our Court of Appeals provides a definition of probable cause:

Probable cause exists when the facts and circumstances within the officers' knowledge, and of which they had reasonably trustworthy information, are sufficient to warrant a man of reasonable caution to believe that an offense has been, or is being, committed. Probable cause means more than a suspicion but less than a

certainty; only a probability of criminal conduct need be shown. The officers do not need to positively know that a crime was committed; nor do they need to specify the exact crime as long as it is a serious crime.

*State v. Copeland*, 105 N.M. 27, 31, 727 P.2d 1342, 1346 (Ct.App.1986) (citations omitted). We conclude that the police had probable cause for arresting Duffy and this conclusion is supported by substantial evidence. Sergeant Sandoval obtained descriptions of the suspect from the three eyewitnesses. He learned from Greene that Duffy had been driving the escape vehicle and Greene's description of Duffy matched the descriptions of the eyewitnesses. As soon as Sergeant Sandoval saw Duffy at the mobile home, he knew Duffy's appearance was similar to the person seen committing the crime. The link between Duffy and the escape vehicle and the descriptions of the assailant provided sufficient probable cause to make the arrest.

{70} Though there was probable cause to arrest Duffy, the State still needed to establish that warrantless entry into the mobile home was justified by exigent circumstances. "Exigent circumstances means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." *Id.* at 31, 727 P.2d at 1346. The determination is not whether the suspect was in fact intending to harm someone, escape, damage property, or destroy evidence. *See State v. Chavez*, 98 N.M. 61, 63, 644 P.2d 1050, 1052 (Ct.App.1982). Rather it is "a determination of whether in a given situation a prudent, cautious, and trained officer, based on facts known, could reasonably conclude swift action was necessary." *Corneau*, 109 N.M. at 89, 781 P.2d at 1167. If there are exigencies, they must be known by the police prior to entry. *Attaway*, 117 N.M. at 152, 870 P.2d at 114. Moreover, the presence of exigent circumstances must be supported by specific articulable facts. *Chavez*, 98 N.M. at 63, 644 P.2d at 1052 (quoting *James v. Superior Court*, 87 Cal.App.3d 985, 151 Cal.Rptr. 270, 274 (Cal. Ct.App.1978)). The State bears the burden

of proving the existence of exigent circumstances. *State v. Sanchez,* 88 N.M. 378, 382, 540 P.2d 858, 862 (Ct.App.), *rev'd on other grounds,* 88 N.M. 402, 540 P.2d 1291 (1975). The decision of the trial court in this matter will be affirmed on appeal if supported by substantial evidence. *Corneau,* 109 N.M. at 89, 781 P.2d at 1167.

{71} The State did demonstrate by substantial evidence that, before the police entered the mobile home, there were articulable exigent circumstances that justified their entry. The police testified that as soon as Duffy saw that they were police officers he became upset and moved out of sight toward the back of the trailer. This caused both officers to believe Duffy was trying to escape or flee, which is a paradigmatic exigent circumstance. Moreover, Duffy acted in an agitated unpredictable manner. They tried to calm him down to no avail. The police knew the purse snatcher had shown brutal disregard for the life of an elderly woman. Considering these factors in light of Duffy's resemblance to the descriptions of the assailant, the police were reasonably concerned about their own safety as well as the safety of Creel and the children. These exigencies justified the immediate entry into the mobile home and the arrest of Duffy without a warrant. The record supports the probable assumption by the police "that there was a need that could not brook the delay incident to obtaining a warrant." *Dorman v. United States,* 435 F.2d 385, 392 (D.C.Cir.1970).

C. Consent

{72} Duffy argues that, prior to the warrantless entry into the mobile home, the State failed to establish that Greene voluntarily gave consent to enter and search his home. It is constitutionally permissible for the police to search a person's home if they have received valid consent from a person who is in possession of or who has common authority over the premises. *Rodriguez,* 497 U.S. at 181, 110 S.Ct. 2793. The misconduct of police may be such that, despite consent, the search will be unlawful. *State v. Bedolla,* 111 N.M. 448, 455, 806 P.2d 588, 595 (Ct.App. 1991). However, the general rule is that, as long as the consent is voluntary, the search will be constitutional even if the police have

neither probable cause nor a warrant. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Article II, Section 10 of the New Mexico Constitution, as well as its federal counterpart, "require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth,* 412 U.S. at 228, 93 S.Ct. 2041.

{73} In order to establish whether a person voluntarily consented to a search, the court must assess the totality of all the surrounding circumstances, including the individual characteristics of the person who gave consent, the circumstances under which the person is detained, and the manner in which police requested the search. *See id.* at 226–29, 93 S.Ct. 2041. The State bears the burden of proving that the consent to search was indeed free and voluntary. *Id.* at 222, 93 S.Ct. 2041.

{74} Duffy argues that Greene was placed by police in a highly coercive situation. He was detained as a suspect in a brutal murder, placed in the back of a police vehicle, possibly handcuffed, and questioned. However, Duffy offers no other evidence that would suggest that Greene's consent was coerced. Greene was never placed under arrest because the police quickly concluded that Greene did not look like the person they were seeking. They detained him only for the purpose of asking questions. He was questioned in a public parking lot, not in the interrogation room of a police station; there was no suggestion that the police committed any overt or implicit act or threat of force against Greene; they made him no promises and they used no subtle forms of coercion to bend his will. *See United States v. Watson,* 423 U.S. 411, 424–25, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

{75} Additionally, Greene had strong motives for cooperating with the police. He was a suspect in the murder because he was driving the escape vehicle. He was probably eager for the police to search his home so as to quash any suspicion that he participated in the murder. Moreover, Greene made it clear he did not want Duffy in his home and, presumably because of the risks raised by Duffy's presence, expressed concern for the safety of the people living in the home. In hopes of removing his family from a danger-

ous situation, he told the police to enter his home and said "Do anything you want. . . . Go ahead and go through whatever you want." For these reasons he would have been willing to have the police enter and search his home.

{76} Thus, even if Duffy did have standing to object to the warrantless entry, arrest, and search, under the totality of the circumstances, the actions of the police were justified by exigent circumstances and Greene's consent to enter and search his home.

## VII. CONCLUSION

{77} For the foregoing reasons we vacate Duffy's conviction of robbery as well as those portions of the judgment and sentence concerning that conviction, and we remand this case with instructions to enter an amended sentence for the remaining convictions of felony murder and tampering with evidence. In all other respects we affirm the verdict of the trial court.

{78} IT IS SO ORDERED.

BACA and MINZNER, JJ., concur.