This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-36530**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**EDUARDO F. FLORES,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LINCOLN COUNTY**
**James Waylon Counts, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
John Kloss, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**DUFFY, Judge.**

**{1}** Defendant Eduardo Flores raises numerous challenges to his convictions for assault with intent to commit a violent felony against a household member (false imprisonment), contrary to NMSA 1978, Section 30-3-14 (1995), kidnapping (second

degree), contrary to NMSA 1978, Section 30-4-1 (2003), and three additional felony and misdemeanor charges not specifically at issue. We affirm.[1]

## BACKGROUND

**{2}** This case arose from a domestic violence incident between Defendant and his girlfriend of two-and-a-half months, Araceli Velasquez Estrada (Victim). At trial, Victim testified that on the night of the incident, she got off work at 11:30 p.m. and went to Defendant's house. Defendant was angry when she arrived and did not believe she had been at work so late. Victim tried to leave and was about to open the door when Defendant put a gun to her head and told her to come back. Victim sat down on the sofa and tried to calm Defendant. Defendant pointed the gun at Victim's forehead and the back of her neck for fifteen minutes and told her not to leave.

**{3}** Later in the evening, Victim escaped from the house, ran to her car, and closed the doors. Defendant went after her. According to Victim, Defendant threatened to damage her car if she did not get out. He tried to open the door on Victim's side, breaking off the door handle. He also tore off the windshield wiper and hit the car, telling Victim that if she did not get out then he would further damage the car. Victim opened the door, at which point Defendant grabbed her by the shoulders and head-butted her, causing an injury to her left eyebrow that would require fifteen stitches. Defendant forced Victim back inside the house, pushing her and pulling her by the hands, and once inside, Defendant sat Victim on the sofa and told her "not to move," for "[her] to stay there." Victim's shirt was bloody from her injury and Defendant told her to take it off. When she refused, Defendant tore the shirt off of her and tried to wash the blood out of it. Victim testified that she wanted to leave but feared Defendant would kill her if she did.

**{4}** Early the next morning, when Defendant went to the back of the house, Victim ran out of the house and down the street until she encountered a woman, Elizabeth Hannah, walking her dog. Defendant chased after Victim but stopped when Victim met Hannah. Hannah took Victim inside her house while Defendant paced back and forth on the porch outside. Hannah told Defendant through the window to calm down and go back to his home, but Defendant did not leave. Hannah declined Victim's request to call the police but drove Victim home, whereupon Victim called the police.

**{5}** After police interviewed Victim, they executed a search warrant at Defendant's home. Police recovered, among other evidence, a blood-stained shirt on the kitchen floor, pillows in the living room that were saturated in blood, a pellet gun, two firearms—a 9 mm Derringer-type gun and a flare gun—and ammunition for the pellet gun and the Derringer. Defendant was arrested and charged with assault with intent to commit a

---

1At the outset we note the high number of issues presented in this appeal. While "[t]here is currently no rule limiting the number of issues a party can present on appeal . . . , we encourage litigants to consider carefully whether the number of issues they intend to appeal will negatively impact the efficacy with which each of those issues can be presented." *Rio Grande Kennel Club v. City of Albuquerque*, 2008-NMCA-093, ¶ 55, 144 N.M. 636, 190 P.3d 1131.

violent felony against a household member for pointing a handgun at Victim, kidnapping related to the later restraint when Defendant dragged Victim back into the house after she escaped to her car, and aggravated battery, tampering with evidence, and tampering with a motor vehicle.

**{6}** Defendant testified at trial and characterized Victim as the aggressor, himself as the victim. According to Defendant, Victim was drunk when she arrived and "started harassing [him] for no reason whatsoever" while he was trying to watch television. After a while, Victim "grabbed about four or five beers" and went outside as if to drive away; he went after her because she was in no condition to drive. Defendant tried to get the keys away from Victim, but Victim had locked herself in the car. Defendant described pulling on the drivers' side handle a bit, and stated that the handle "came right off." This angered Victim and she got back out of the car and went straight at him, "wrestling [him] like a guy. Literally, fighting [him] like a guy." Eventually, Defendant "wiggled free," but Victim grabbed him in a bear hug and when Defendant tried to back away, she head-butted him.

**{7}** Defendant described how afterward, Victim voluntarily followed him back into the house where he cleaned and taped her wound. Defendant stated that he offered to call Victim a taxi to take her to the hospital but Victim did not want to go. Defendant admitted that at some point during the night, "when [Victim] least expected it," he deflated the tires on her car to keep her from leaving. When Defendant woke up, Victim was still watching television and drinking, but she got up and started walking off toward her car. Defendant followed to make sure she was all right, but Victim started running; Defendant claimed he did not chase after her. Defendant denied seeing, much less owning the guns that the State introduced at trial.

**{8}** The jury convicted Defendant on all charges.

**DISCUSSION**

**I.      Specific Challenges to Defendant's Convictions for Assault with Intent to Commit False Imprisonment and Kidnapping**

**A.      Double Jeopardy**

**{9}** Defendant argues that his convictions for assault with intent to commit false imprisonment and kidnapping violate his right to be free from double jeopardy. "Double jeopardy challenges involve constitutional questions of law that we review de novo." *State v. Simmons*, 2018-NMCA-015, ¶ 25, 409 P.3d 1030. To evaluate Defendant's double-description challenge, we apply the two-part analysis set out in *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223. "The first part of our inquiry asks . . . whether the conduct underlying the offenses is unitary, i.e., whether the same conduct violates both statutes. The second part focuses on the statutes at issue to determine whether the legislature intended to create separately punishable offenses."

*Id.* "If the conduct is not unitary, the analysis ends and double jeopardy does not apply." *State v. Silvas*, 2015-NMSC-006, ¶ 9, 343 P.3d 616.

**{10}** "When determining whether Defendant's conduct was unitary, we consider whether Defendant's acts are separated by sufficient 'indicia of distinctness.' " *State v. DeGraff*, 2006-NMSC-011, ¶ 27, 139 N.M. 211, 131 P.3d 61. "The statutory definition of the relevant crimes controls the conduct we consider," *id.* ¶ 28, and "[t]he proper analytical framework is whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." *State v. Franco*, 2005-NMSC-013, ¶ 7, 137 N.M. 447, 112 P.3d 1104 (internal quotation marks and citations omitted) (stating that "we consider such factors as whether acts were close in time and space, their similarity, the sequence in which they occurred, whether other events intervened, and the defendant's goals for and mental state during each act"). "If two events are sufficiently separated by either time or space (in the sense of physical distance between the places where the acts occurred), then it is a fairly simple task to distinguish the acts." *Swafford*, 1991-NMSC-043, ¶ 28.

**{11}** The essence of Defendant's double jeopardy challenge is that his conduct amounted to a single, ongoing kidnapping that began when he threatened Victim with the gun. Based on that premise, Defendant argues that the restraint underlying both convictions was unitary, "notwithstanding the State's effort to arbitrarily divide the conduct at issue by characterizing one act of forcible restraint as an assault with intent to commit false imprisonment . . . and the other as kidnapping." Our double jeopardy review, however, is grounded in the charges actually presented to the jury. *See Franco*, 2005-NMSC-013, ¶ 7 (stating that the unitary conduct analysis evaluates whether there are "independent factual bases for the *charged offenses*" (emphasis added) (internal quotation marks and citation omitted)).

**{12}** Defendant's assault charge required the jury to find that "[D]efendant put a handgun against [Victim's] head" with the intent to commit false imprisonment on Victim. The kidnapping charge was based on separate conduct occurring later that night when Defendant forced Victim back inside his home after she escaped to her car; the jury was instructed that in order to find Defendant guilty, it must find that "[D]efendant took, restrained, or confined [Victim] by force or intimidation by forcing her back into his home." The acts underlying the two charges were separated by time and location, and each crime was marked by a distinct act of violence. *See Swafford*, 1991-NMSC-043, ¶ 38 (holding that the assaultive episode was sufficiently distinct and non-unitary where the defendant bound the victim to the bed, struck her several times, and threatened her verbally for a period of time before commencing the sexual assault); *State v. Montoya*, 2011-NMCA-074, ¶ 31, 150 N.M. 415, 259 P.3d 820 (stating that sufficient indicia of distinctness exist when the convictions are supported by distinct acts or forces). "Based on the elements stated in the [jury] instructions and the evidence produced at trial, the jury had an independent factual basis for finding each act." *Franco*, 2005-NMSC-013, ¶ 9. Consequently, we need not reach the second part of the analysis to conclude Defendant's convictions for assault and kidnapping do not violate double jeopardy. *See Swafford*, 1991-NMSC-043, ¶ 38.

**B.     Sufficiency of the Evidence**

**{13}**     Defendant next argues that the evidence was insufficient to support his kidnapping conviction. The jury instruction required the State to prove:

> 1.     [D]efendant took, restrained, or confined [Victim] by force or intimidation by forcing her back into his home;
>
> 2.     [D]efendant intended to inflict physical injury on [Victim];
>
> 3.     This happened in New Mexico on or about the 8th day of August, 2015.

*See* UJI 14-403A NMRA; *State v. Garcia*, 2009-NMCA-107, ¶ 21, 147 N.M. 150, 217 P.3d 1048 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." (internal quotation marks and citation omitted)). Defendant challenges the sufficiency of the evidence supporting the second element, arguing that "[w]hile the evidence established that [Defendant] was willing to injure [Victim] in order to restrain or confine her, there was no evidence that he undertook the restraint in order to injure her."

**{14}**     "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). We "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We disregard all evidence and inferences that support a different result. *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "Because an individual's intent is seldom subject to proof by direct evidence, intent may be proved by circumstantial evidence." *State v. Allen*, 2000-NMSC-002, ¶ 65, 128 N.M. 482, 994 P.2d 728 (internal quotation marks and citation omitted).

**{15}**     Here, testimony regarding Defendant's conduct provides adequate support for the jury's finding that Defendant intended to inflict a physical injury on Victim. Notably, when Victim escaped and locked herself inside her car, Defendant broke the door handle off and threatened further damage if Victim remained inside. As soon as she acquiesced and opened the door, Defendant grabbed Victim by the shoulders and head-butted her, splitting open her eyebrow.[2] Although the State's theory was that the kidnapping occurred shortly afterward when Defendant dragged Victim back inside the house, "evidence of injury may be used by the jury as circumstantial evidence of intent." *State v. Sotelo*, 2013-NMCA-028, ¶ 16, 296 P.3d 1232 (stating that "it is the intent to cause injury, not the injury itself, that distinguishes kidnapping from false

---

[2]Defendant was separately charged with aggravated battery relative to this conduct and does not challenge that conviction on appeal.

imprisonment"). Based on the foregoing, a jury could reasonably infer that Defendant intended to injure Victim when he pulled her back into the house. Defendant's intent being the only challenged element, we hold that there was sufficient evidence to support Defendant's kidnapping conviction.[3]

## C.  Jury Instruction on Incidental Restraint

**{16}**   Defendant also argues that the district court erred by failing to instruct the jury on incidental restraint as an element of the kidnapping instruction. *See* UJI 14-403A(4) NMRA. Because this claim was not preserved, our review is for fundamental error. *See State v. Sena*, 2020-NMSC-011, ¶ 34, 470 P.3d 227.

> In reviewing a failure to instruct for fundamental error, we determine whether a reasonable juror would have been confused or misdirected by the jury instruction. Juror confusion or misdirection may stem from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law. In addition, fundamental error occurs when jury instructions fail to inform the jurors that the State has the burden of proving an essential element of a crime and we are left with no way of knowing whether the jury found that element beyond a reasonable doubt.

*Id.* (alterations, internal quotation marks, and citations omitted).

**{17}**   In this case, the jury instruction given at trial conformed to the applicable uniform jury instruction for second degree kidnapping, UJI 14-403A, but omitted an instruction on incidental restraint. *See* UJI 14-403A(4). According to the use notes, the incidental restraint instruction is used "if the evidence raises a genuine issue of incidental conduct, whether or not a secondary offense is simultaneously charged." UJI 14-403, use note 8. Our Supreme Court has recognized that while certain factual scenarios may present a jury question "as to whether the restraint relied upon to support a conviction for kidnapping was merely incidental to another crime[,]" *Sena*, 2020-NMSC-011, ¶ 38, others are clear enough for an appellate court to decide as a matter of law. *See, e.g.*, *id.* ¶ 39 (holding that incidental restraint was not at issue where the facts established that the restraints underlying the charged offenses were separate and distinct); *State v. Trujillo*, 2012-NMCA-112, ¶ 6, 289 P.3d 238 (holding that in the factual context presented, "the restraint described by the testimony—a momentary grab in the middle of

---

[3]Although Defendant also asks us to reduce the statutorily-prescribed sentence for assault, his argument is conclusory, inadequately developed, and not supported by authority, and we decline to review it on that basis. *See State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031(explaining that appellate courts are under no obligation to review unclear or undeveloped arguments); *see also Lukens v. Franco*, 2019-NMSC-002, ¶ 5, 433 P.3d 288 ("When a criminal conviction is being challenged, counsel should properly present this [C]ourt with the issues, arguments, and proper authority. Mere reference in a conclusory statement will not suffice and is in violation of our rules of appellate procedure." (internal quotation marks and citation omitted)).

a fight—is as a matter of law insufficient to support a conviction for kidnapping"). The factual scenario in this case falls into the latter category.

**{18}**     Defendant contends that because he was "charged with a battery for conduct done to subdue [Victim] in order to kidnap her and because he was also charged with assault with intent to commit false imprisonment for the same continuous restraint, it was necessary to give the incidental restraint instruction here to clarify how the allegations fit together." To agree with Defendant, we would need to conclude there is a factual question about whether the restraint relied upon to support the kidnapping was "slight, inconsequential, or merely incidental" to the assault or battery. But as we have discussed, both the assault and battery were complete before Defendant forced Victim back into the house, where Defendant continued to prevent her from leaving until she fled the next morning. There is simply no view of the evidence in which the prolonged restraint underlying the kidnapping can be characterized as merely incidental to the commission of the other crimes. *See* UJI 14-403 NMRA comm. cmt. 1, 4 (stating that factors considered in determining whether restraint is incidental include, among others, "whether the conduct is necessary to the commission of another crime;" "whether the defendant took, restrained, confined, or transported the victim for a longer period of time or to a greater degree than that which is necessary to commit another crime;" and "whether the defendant acted with a purpose or intent beyond the commission of another crime"). Because these circumstances present no genuine issue of incidental conduct for the jury to decide, there was no fundamental error in failing to instruct the jury on incidental restraint as set out in UJI 14-403A(4).

## II.     Evidentiary Issues

**{19}**     Defendant argues that the district court erred in four evidentiary rulings.[4] We review the district court's evidentiary rulings for an abuse of discretion. *State v. Sarracino*, 1998-NMSC-022, ¶ 20, 125 N.M. 511, 964 P.2d 72.

## A.     Victim's Statement to Police About Defendant's Dog

**{20}**     Defendant claims that he should have been allowed to question Victim and Detective Wallace Downs, an officer who investigated the matter, about a prior statement Victim made to police during her initial interview. Through an interpreter, Victim allegedly conveyed to Detective Downs that Defendant had thrown his dog across the living room during the incident. When Victim testified at trial that Defendant had "pushed" his dog, defense counsel sought to impeach Victim's account with statements in the police report, which contained an officer's summary of Victim's interview. The next day, defense counsel again broached the subject of Victim's statement, asking Detective Downs generally about what Victim said during the

---

4Defendant also stated in a heading in his brief in chief that the district court erred by not allowing him to testify regarding injuries he suffered navigating the steep terrain around his house, apparently unrelated to the incident. Because he did not develop his argument beyond that, we are unable to substantively address the matter. *See State v. Fuentes*, 2010-NMCA-027, ¶ 29, 147 N.M. 761, 228 P.3d 1181 (stating that we will not review undeveloped arguments).

interview. The district court sustained the State's objections to both lines of questioning on foundational and hearsay grounds, respectively.

**{21}** Assuming without deciding that the district court erred in limiting Defendant's cross examination of Victim and Detective Downs regarding Victim's prior statements to the police, we conclude any error was harmless. *State v. Astorga*, 2015-NMSC-007, ¶ 42, 343 P.3d 1245 ("When an error is preserved, we review for harmless error[.]"). "Absent a constitutional violation, we look to whether there is a reasonable probability that the error affected the verdict." *Id.* ¶ 43. "Defendant bears the initial burden of demonstrating that he was prejudiced by the error." *Id.*

**{22}** We are doubtful that Defendant's proposed line of questioning would have influenced the jury's verdict. We note that both Victim's initial statement to Detective Downs and her trial testimony were relayed through interpreters, and although Defendant contends that Victim's trial testimony was "noticeably different" from what she said during her interview, "thrown" and "pushed" have comparable meanings and convey substantively similar descriptions of Defendant's conduct. Given the minimal discrepancy, the value of any impeachment based on Victim's prior statement is "too dubious for us to conclude that its admission would have influenced the jury's deliberations in Defendant's favor." *State v. Garcia*, 2013-NMCA-064, ¶ 20, 302 P.3d 111. Any error was therefore harmless.[5]

## B. Domestic Violence Visas

**{23}** Defendant also sought to question Victim about her legal status in the United States and her knowledge of certain visas which, according to Defendant's trial counsel, can be obtained if "a person . . . in the country illegally can show that they were battered by a household member." Defendant argues that the district court erred by excluding this evidence.

**{24}** Defendant did not present any evidence that Victim was in the country illegally or that she was eligible for such a visa. *Cf. State v. Huerta-Castro*, 2017-NMCA-026, ¶¶ 40-47, 390 P.3d 185 (holding that the district court erred in suppressing favorable impeachment evidence of a witness's U-Visa application, which included letters from individuals working in the district attorney's office and the investigating detective). Notwithstanding this, defense counsel "insisted that it was [Victim's] awareness or belief

---

5Defendant also argues that Victim's prior statement was admissible during his cross-examination of Detective Downs "to explain the officers' investigation and deficiencies or bias related to the same [because p]art of [Defendant's] defense was that the investigation was flawed and that the officers ignored or failed to pursue evidence which contradicted or undercut [Victim's] claims." After reviewing the record, we do not see where Defendant offered this explanation to the district court in response to the State's hearsay and foundation objections. *See State v. Quinones*, 2011-NMCA-018, ¶ 23, 149 N.M. 294, 248 P.3d 336 ("[The d]efendant must make a timely objection that specifically apprises the district court of the nature of the claimed error and invokes an intelligent ruling thereon."); Rule 12-321(A) NMRA ("To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked."). Because the issue was not preserved for appeal, we decline to address it. *Quinones*, 2011-NMCA-018 ¶ 26.

that mattered since her belief that she could get such a visa . . . was relevant to her motive to lie[,]" and that "this is something that's basically common knowledge" among his clients. However, it does not appear defense counsel explored this potential area of bias with Victim prior to trial and counsel's insistence that Victim would be so motivated appears to be based on speculation. After considering the parties' arguments and the materials submitted by counsel, the district court concluded the proposed line of questioning was speculative and more prejudicial than probative under Rule 11-403.

**{25}**  Appellate courts traditionally leave such rulings to the broad discretion of the trial court because such decisions are necessarily fact sensitive. *See State v. Bailey*, 2017-NMSC-001, ¶ 16, 386 P.3d 1007 ("The determination of unfair prejudice is fact-sensitive, and, accordingly, much leeway is given trial judges who must fairly weigh probative value against probable dangers." (internal quotation marks and citations omitted)). Given the lack of evidence establishing that Victim was aware of, had sought, or even that she might qualify for a visa, we agree with the district court's conclusion that any probative value was merely speculative. Likewise, the district court's conclusion that such evidence was unfairly prejudicial was not outside the leeway given to trial courts to make such fact-sensitive decisions. *See id.*; *see also* Rule 11-403 (providing that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"). We find no abuse of discretion in the district court's ruling.

## C.      Phases of the Moon

**{26}**  During his cross-examination of Detective Downs, Defendant asked the district court to take judicial notice of information purportedly from NASA indicating the positions of the moon. During a bench conference on the matter, the district court asked, "What is this telling me?" Defense counsel responded, "It's telling you, your honor, that on the date of this incident it was dark outside; there wasn't a full moon." The district court took judicial notice only of "the fact that it's dark at night," and did not notice the specific lunar phase on the night of the incident.

**{27}**  On appeal, Defendant maintains that the district court erred in refusing to take judicial notice of the lack of a full moon on the night in question. We, however, are unable to review the propriety of Defendant's request because the record on appeal does not include the information he presented to the district court. *See* Rule 11-201(B)(2) NMRA (stating that a "court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined *from sources whose accuracy cannot reasonably be questioned*" (emphasis added)). "It is defendant's burden to bring up a record sufficient for review of the issues he raises on appeal. If he does not, all inferences will be resolved in favor of the trial court's ruling." *State v. Jim*, 1988-NMCA-092, ¶ 3, 107 N.M. 779, 765 P.2d 195 (citation omitted).

## D.      Nighttime Photograph

**{28}** In a single paragraph, Defendant argues that the district court abused its discretion in excluding a nighttime photograph depicting the front of his parent's cabin, located next door on a shared property. Defense counsel sought to introduce the photo while Defendant was on the stand to establish how the area around his home looked at night. During the State's ensuing voir dire, Defendant said he did not know when the photo was taken or what conditions, such as the moon, stars, or cloud cover, were present when the photo was taken. The State objected, arguing that the photograph cannot be admitted to represent the conditions on the night of the incident. The district court agreed, saying there were "too many variables."

**{29}** Even if we were to conclude that the district court erred in excluding the photograph, Defendant has offered no argument demonstrating how he was prejudiced by the error under the applicable harmless error standard. *See Astorga*, 2015-NMSC-007, ¶ 43. Given that Defendant also testified at length about the lighting conditions around his home on the night of the incident—stating multiple times that it was black outside and you could not see anything—we cannot conclude that the exclusion of the photo had any impact on the jury's verdict. *See State v. Tollardo*, 2012-NMSC-008, ¶ 36, 275 P.3d 110 ("[N]on-constitutional error is harmless when there is no reasonable probability the error affected the verdict." (emphasis, internal quotation marks, and citation omitted)).

### III.    Comments on Defendant's Silence

**{30}** Defendant argues that the prosecutor committed misconduct by commenting on Defendant's silence at three points during trial: when the prosecutor (1) contrasted Defendant's "failure to contact and speak to the police with [Victim's] willingness to do so" during closing argument; (2) asked Detective Downs during direct examination about his efforts to get Defendant's "side of the story"; and (3) asked Detective Downs about subsequent police attempts to get Defendant's "side of the story."[6] In the absence of an objection, as here, we review comments on a defendant's silence as prosecutorial misconduct by applying "essentially the same fundamental error analysis used in post-arrest comment on silence cases." *DeGraff*, 2006-NMSC-011, ¶ 16. "This review consists of two parts. We first determine whether any error occurred, i.e., whether the prosecutor commented on the defendant's protected silence. If such an error occurred, we then determine whether the error was fundamental." *Id.* ¶ 21.

**{31}** We initially reject Defendant's first two claims of error because the prosecutor's comments did not relate to protected silence. Defendant's first claim concerns the prosecutor's statement during closing argument that Defendant had not been the one to call law enforcement even though he claimed to be the real victim of the attack. The prosecutor observed,

---

[6]Defendant did not distinguish between pre-arrest and post-arrest or post-*Miranda* silence in his briefing, choosing instead to address all three comments as a single error. *See DeGraff*, 2006-NMSC-011, ¶¶ 11-15.

What does [Victim] do once she gets to her home? She immediately calls law enforcement after asking [another individual] to call law enforcement. Once [Victim] gets to a phone at her house, she does. [Victim] calls law enforcement right away. Who doesn't? The defendant. Eduardo Flores. He told you he was the one who was head-butted. He was the one who was assaulted by a mean drunk. He was the one who was diffusing the situation. Call law enforcement.

In context, the prosecutor's statements fall within the permissible use of pre-arrest silence for impeachment purposes. *See State v. Foster*, 1998-NMCA-163, ¶ 13, 126 N.M. 177, 967 P.2d 852 (recognizing that "the privilege against self-incrimination is no bar to impeaching a defendant's testimony with evidence of the defendant's silence prior to arrest"); *Id.* ¶¶ 15, 18 (noting that the rules of evidence do not bar the use of unprivileged silence for impeachment purposes). The prosecutor was not inviting the jury to conclude that Defendant's pre-arrest silence was evidence of guilt, but rather, that Defendant's portrayal of himself as the victim was not credible based on a comparison of the parties' conduct. *See DeGraff*, 2006-NMSC-011, ¶ 8 (stating that "[w]e evaluate the statement in context to determine the manifest intention that prompted the remarks" (internal quotation marks and citation omitted)). We find no error in these comments.

**{32}** Nor do we find error in the prosecutor's questioning of Detective Downs regarding his conversation with Defendant while other officers were executing the search warrant inside Defendant's home. Detective Downs testified that police found two firearms and a pellet gun underneath the couch in Defendant's living room during the search. The detective then testified about the following exchange with Defendant:

Downs: [Defendant] was placed in a police car and before he was transported I did make an effort to speak with him. Read him his *Miranda* advisement and started asking him a few questions.

Prosecutor: Were you able to get his side of the story?

Downs: No, . . . I was giving him direct questions . . . he did agree to talk to me. I asked him if there was firearms in the house. He said, No, that he gotten rid of his firearms, I believe, in New York, or something to that effect. I started asking him about the status of his relationship with the victim and he . . . indicated he didn't want to speak to me anymore by giving evasive answers or not answering my questions.

Prosecutor: And that kind of ended your interview?

Downs: Yes.

**{33}** Given that Defendant chose to speak with Detective Downs after receiving *Miranda* warnings, the prosecutor's questions cannot be construed as a comment on Defendant's silence. *See Rojo*, 1999-NMSC-001, ¶ 56 ("Given that [the d]efendant spoke with the arresting officer after receiving *Miranda* warnings and testified in his own defense at trial, the prosecutor's statement during closing arguments cannot be construed as a comment on [the d]efendant's failure to testify or his invocation of the right to remain silent after his arrest."); *see also State v. McDowell*, 2018-NMSC-008, ¶ 13, 411 P.3d 337 ("A statement is not silence[.]"); *DeGraff*, 2006-NMSC-011, ¶ 20 (stating that a defendant's "silence is protected only if a right to remain silent is invoked"); *Foster*, 1998-NMCA-163, ¶14 (stating that the defendant did not invoke his right to silence when he chose to speak with an officer after receiving *Miranda* warnings). Although Defendant complains that "his reliance on his right to silence and to stop questioning during an interview was not supposed to be used against him at trial[,]" our Supreme Court has acknowledged that "the recounting witness may conclude the account in a natural fashion by indicating that there is nothing more to say because the defendant chose to stop. Otherwise, the jury might erroneously infer that the police cut the interview short before the defendant had a full opportunity to give his account." *Allen*, 2000-NMSC-002, ¶ 28 (internal quotation marks and citation omitted). Consequently, we find no error in the prosecutor's questioning or the testimony elicited in response.

**{34}** Defendant's final claim of error centers on the following exchange between the prosecutor and Detective Downs:

> Prosecutor:   Did you try and do a follow up or have anyone do a follow-up with Defendant at all?
>
> Downs:   Yes.
>
> Prosecutor:   Did he give his side of the story?
>
> Downs:   I had asked a detective that I work with to interview . . . Defendant, who was in the county jail.
>
> Prosecutor:   Yes or no, were you able to get [Defendant's] side of the story?
>
> Downs:   No.

**{35}** We assume without deciding that this exchange amounted to an improper comment on protected silence. *See DeGraff*, 2006-NMSC-011, ¶ 20 (assuming that the defendant invoked his right to remain silent while in custody). Nevertheless, "[f]undamental error requires the defendant to show a reasonable probability that the error was a significant factor in the jury's deliberations relative to the other evidence before them." *McDowell*, 2018-NMSC-008, ¶ 18. Applying this analysis, we conclude Defendant has not met this burden here.

**{36}** In context, the prosecutor's question and Detective Downs's response were isolated, brief, and indirect. *See DeGraff*, 2006-NMSC-011, ¶ 21 (recognizing that "more direct prosecutorial comments on a defendant's invocation of the right to remain silent are more likely to be fundamental error"). The prosecutor asked no additional questions on the matter and Detective Downs offered no testimony to explain why police were unable to get Defendant's side of the story while he was in jail, such as that he declined to speak with them or otherwise exercised his constitutional rights. *Cf. McDowell*, 2018-NMSC-008, ¶ 6 (holding that fundamental error occurred where prosecutor twice commented on the defendant's exercise of his right to counsel during a police interview and elicited testimony that as a result of the defendant's request for an attorney, police could not question him further). Most critically, the State never called upon the jury to infer guilt from Defendant's silence. *See Allen*, 2000-NMSC-002, ¶ 30 (finding no plain or fundamental error where the prosecutor "did not argue to the jury that they should infer [the d]efendant's guilt from the fact that he stopped talking after making the statement in question, or that [the d]efendant had an obligation to elaborate on his prior statement").

**{37}** This stands in stark contrast to *McDowell*, the sole case relied on by Defendant to establish prejudice, where "[t]he prosecutor not only questioned the detective twice about the fact that [the d]efendant invoked his right to an attorney, the prosecutor emphasized the import of [the d]efendant's decision by eliciting from the detective the fact that by invoking his right to an attorney, the detective could not get information from [the d]efendant." 2018-NMSC-008, ¶ 22 (stating, "[t]his was the classic contrast—the innocent speak, while the guilty remain silent"). Under the circumstances presented here, Defendant has not shown any reasonable probability that the prosecutor's brief comment was a significant factor in the jury's deliberations. *See DeGraff*, 2006-NMSC-011, ¶ 21. Consequently, even if the comment was erroneous, it was not fundamental error.

## IV.    Other Prosecutorial Misconduct Claims

**{38}** In the last two pages of his brief, Defendant points to an additional sixteen instances that he contends are improper statements by the prosecutor during closing argument. These can be grouped into three categories: (1) referencing facts not in evidence, (2) vouching for Victim, and (3) accusing Defendant, Defendant's mother, and defense counsel of lying. As with the previous claims of prosecutorial misconduct, these claims are unpreserved and our review is only for fundamental error. *See Allen*, 2000-NMSC-002, ¶ 95 ("Prosecutorial misconduct rises to the level of fundamental error when it is so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." (internal quotation marks and citation omitted)).

## A.    Alleged References to Facts Not in Evidence

**{39}** Defendant argues that the prosecutor committed misconduct by referring to three facts not in evidence. *See State v. Duffy*, 1998-NMSC-014, ¶ 56, 126 N.M. 132, 967

P.2d 807 ("It is misconduct for a prosecutor to make prejudicial statements not supported by evidence."), *overruled on other grounds by Tollardo*, 2012-NMSC-008.

**{40}** Defendant first challenges the prosecutor's remarks to the effect that "[Victim]'s testimony was entirely consistent with her statement to the police." Although the content of Victim's statement to police was not admitted into evidence, Detective Downs testified that the search warrant was based in part on Victim's initial statement and included "firearms, because there was a firearm involved, according to [Victim]." Downs testified that "Victim described the firearm as small and black," and that police recovered a pistol. Downs also testified that the warrant included "blood evidence" and that police found blood evidence in the house, including the bloodied shirts Victim and Defendant had been wearing (one appeared to have been laundered), along with several pillows that were saturated in blood, pillowcases, and bandages. This testimony provided a sufficient evidentiary basis to bring the prosecutor's closing statements within the wide latitude allowed for closing arguments. *State v. Herrera*, 1972-NMCA-068, ¶ 8, 84 N.M. 46, 499 P.2d 364 ("Statements having their basis in the evidence, together with reasonable inferences to be drawn therefrom, are permissible and do not warrant reversal." (internal quotation marks and citation omitted)).

**{41}** Defendant's second claim of error concerns the prosecutor's suggestion that Defendant was angry because he "probably" thought Victim was cheating on him. The prosecutor's theory, though clearly prefaced as conjecture, was nevertheless grounded in evidence establishing that Defendant was suspicious of and angry about Victim's behavior. Victim testified that Defendant was angry because she arrived late and Defendant did not believe that she had been at work. Defendant also testified that he thought Victim was lying to him. Given this, we cannot conclude that the prosecutor's theory was outside the bounds of reasonable inference based on the evidence presented at trial. *State v. Calvillo*, 1990-NMCA-046, ¶ 18, 110 N.M. 114, 792 P.2d 1157 ("A prosecutor may make comments about the evidence, and is given latitude in his closing argument, in which he may discuss inferences which can be drawn from the evidence.").

**{42}** Finally, Defendant takes issue with the prosecutor's reference to the cycle of abuse in his rebuttal. During closing, defense counsel spoke at length about how Victim's account was not credible in light of the fact that she continued to visit Defendant three times after the attack. In rebuttal, the prosecutor responded that it would be contrary to common sense to discount a domestic violence victim's testimony on the basis that she "went back to her domestic violence relationship." Because the prosecutor was simply responding to defense counsel's closing argument and invoked common sense to address Defendant's attack on Victim's credibility, we find no error in the prosecutor's remarks. *See State v. Sosa*, 2009-NMSC-056, ¶ 23, 147 N.M. 351, 223 P.3d 348; *State v. Trevino*, 1993-NMSC-067, ¶¶ 15-16, 116 N.M. 533, 865 P.2d 1172 (stating that the state may rely on the "common sense and the pooled knowledge" of the jury regarding a victim's behavior).

**B.     Vouching for Victim**

**{43}** Defendant cites seven instances in the State's closing argument in which the prosecutor allegedly vouched for Victim's credibility. "Prosecutors are permitted to comment on the veracity of witnesses so long as the statements are based on the evidence—not personal opinion—and are not intended to incite the passion of the jury." *State v. Dominguez*, 2014-NMCA-064, ¶ 23, 327 P.3d 1092. "However, a prosecutor cannot vouch for the credibility of a witness, either by invoking the authority and prestige of the prosecutor's office or by suggesting the prosecutor's special knowledge." *Id.* (internal quotation marks and citations omitted).

**{44}** Having reviewed the cited portions of the closing argument, there is no indication that the prosecutor's statements regarding Victim's veracity ran afoul of these prohibitions. "The prosecutor did not personally vouch for Victim's credibility, either by insinuations of special knowledge or by virtue of [his] role as prosecutor." *Id.* ¶ 24. Rather, the prosecutor made his case for why the jury should believe Victim and not Defendant by highlighting evidence that supported Victim's version of events. We find no prosecutorial misconduct in these statements.

## C.     Calling Defendant, Defendant's Mother, and Defense Counsel Liars

**{45}** Defendant also argues that the prosecutor improperly "decried [Defendant], [Defendant's] mother, and even defense counsel of trying to distract the jury from the truth, lying, and making incredulous arguments." "Such comments are not impermissible, as long as they are not expressed as personal opinion or intended to incite prejudice toward a defendant. Where a case essentially revolves around which of two conflicting stories is true, a party may reasonably infer, and thus argue, that the other side is lying." *State v. Salas*, 2017-NMCA-057, ¶ 32, 400 P.3d 251 (internal quotation marks and citations omitted). "And where the defendant has testified, the state has a right to inquire into and comment upon the credibility of the defendant as a witness." *Dominguez*, 2014-NMCA-064, ¶ 25 (alterations, internal quotation marks, and citation omitted). Defendant having made no further argument on the matter, we find no prosecutorial misconduct in regard to these statements.

**{46}** And finally, Defendant argues that the prosecutor impermissibly called defense counsel a liar in closing. "[W]e view the comment at issue in context with the closing argument as a whole and in the context of the remaining trial proceedings so that we may gain a full understanding of the comments and their potential effect on the jury" *State v. Torres*, 2012-NMSC-016, ¶ 8, 279 P.3d 740 (internal quotation marks and citation omitted). The prosecutor's remarks were as follows:

> [Defense counsel] just made a huge issue with the fact that there was a slope. Where [Defendant] lives, it was so steep and so dark there was absolutely no way that someone who lives there, has lived there for a very long time, would be able to drag somebody in the dark up to the door. That's a ridiculous argument. Ridiculous . . . . He wants you to believe that there's no way that this Defendant could pull this Victim because she's heavy. That's a lie. He wants to distract you from the truth: that it's very,

very reasonable for a person the size of [Defendant to] have dragged someone who has just been head-butted up the slope.

Taken in context, we view the prosecutor's remark as a comment on the evidence rather than a personal attack on Defendant's attorney. *See id.* ¶ 19 (noting that it is "improper for the prosecutor to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case, because casting uncalled for aspersions on defense counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom" (alteration, internal quotation marks, and citation omitted)). While we understand Defendant's concern and caution the State to take care in its remarks, we are not persuaded that the prosecutor's comments were improper here.

## V.      Cumulative Error

**{47}**     In a single sentence, Defendant contends that all of the errors raised on appeal constitute cumulative error sufficient to warrant reversal. *See generally State v. Martin*, 1984-NMSC-077, ¶ 17, 101 N.M. 595, 686 P.2d 937 ("Cumulative error requires reversal of a defendant's conviction when the cumulative impact of errors which occurred at trial was so prejudicial that the defendant was deprived of a fair trial."); *see also State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328 ("The doctrine of cumulative error is to be strictly applied, and cannot be invoked if the record as a whole demonstrates that the defendant received a fair trial." (alterations, internal quotation marks, and citation omitted)). Although we have assumed there were two errors in this appeal, neither presented grounds for reversal, and Defendant's briefing is not adequately developed to permit further review. *State v. Duttle*, 2017-NMCA-001, ¶ 34, 387 P.3d 885 (stating that this Court will not rule on inadequately briefed issues where doing so would require this Court to develop the arguments, effectively performing the parties' work for them).

## CONCLUSION

**{48}**     For all of the foregoing reasons, we affirm.

**{49}     IT IS SO ORDERED.**

**MEGAN P. DUFFY, Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**BRIANA H. ZAMORA, Judge**